Paul BYERS, Appellant,

v.

UNITED STATES, Appellee.

Nos. 89–CF–434, 90–CO–1323.

District of Columbia Court of Appeals.

Argued Oct. 4, 1991.
Decided Oct. 20, 1994.

Curt S. Hansen, for appellant.

Shanlon Wu, Asst. U.S. Atty., and Jay B. Stephens, U.S. Atty. at the time the brief was filed, and John R. Fisher, Thomas C. Black, and Debra L. Long–Doyle, Asst. U.S. Attys., were on the brief, for appellee.

Before WAGNER, Chief Judge,* FERREN ** and TERRY,*** Associate Judges.

WAGNER, Chief Judge:

Following a jury trial, appellant was convicted of one count of first-degree murder while armed (D.C.Code §§ 22–2401, –3202 (1989)) and one count of carrying a pistol without a license (CPWL) (D.C.Code § 22–3204 (1989)). Subsequently, the trial court denied without a hearing appellant's motion for a new trial based on a claim of newly discovered evidence. On appeal, appellant argues for reversal on the grounds that the trial court erred in: (1) denying his motion for a new trial; (2) allowing the government to impeach its own witnesses without an adequate foundation or cautionary instructions; (3) failing to instruct the jury adequately on unanimity; (4) allowing the prosecutor to make improper closing and rebuttal arguments; and (5) permitting the government to present a theory of the case substantially at variance with the indictment. We affirm.

## I.

Jeffrey Williams died as a result of a gunshot wound to the back and head injuries sustained on December 7, 1987. The events leading to Williams' death began that evening when he went to an apartment building at 529 Lamont Street, N.W. where he encountered co-defendants, Albert Curseen and Everett Baylor, standing in the hallway selling drugs. After some discussion, Williams agreed to purchase a twenty dollar bag of cocaine. While being shown the drugs, Williams tried to switch a "dummy bag" for one of the seller's bags. Co-defendant Curseen asked Williams, "Why you try to switch

---

* Judge WAGNER was an Associate Judge of this court at the time of argument. Her status changed to Chief Judge on June 14, 1994.

** Judge FERREN concurs in the result.

*** Former Chief Judge ROGERS was a member of the division that heard oral argument. After her departure from the court, Associate Judge TERRY was selected by lot to replace her.

up on my boys?" Curseen, Baylor and several other men then began beating Williams about his body and face. Appellant emerged from an apartment in the building and joined in the assault. Someone swung a bat at Williams, and appellant said, "Don't hit him with the bat." Finally, appellant said, "Come on, y'all, leave him alone."

Williams left the building, but he soon returned and attacked one member of the group with a metal rake. Again, some men came out of the apartment, and Williams attempted to retreat. They caught Williams in the alley and beat him again. Curseen went back into the apartment, obtained a gun, and returned to the alley where appellant and co-defendant Baylor urged Curseen to shoot Williams. Curseen attempted to fire the weapon, but failed in his effort because the safety was still on. Curseen fired again, but he missed Williams. Witnesses lost sight of the three when they rounded a corner. There was testimony that a gunshot rang out, and the men who had remained behind ran back into the apartment. When appellant and co-defendant Curseen returned to the apartment, Curseen said, "[w]e shot him, we shot him," and appellant responded, "A.J. [Curseen], you are a crazy [MF]."

At the time, appellant lived in the apartment, which was the home of five sisters, Sharron Webb, LaDonn, Eyvonne, Raeshawn and LaWann Garris, who were called by the government as witnesses at trial. LaDonn Garris testified that after the shooting she heard appellant say "[t]hat he shot the gun." Raeshawn Garris testified that she heard appellant say that he "[s]hot the man." Eyvonne Garris testified that she heard appellant say that "he shot him" (referring to Williams), but she could not remember when appellant made the statement. LaWann Garris testified that several months later, in July or August 1988, she heard appellant admit that he shot Williams. According to

her, appellant also said that he would find out who had been "snitching" on him. Raeshawn Garris also testified that while sitting on the porch appellant said that "he killed the man."

Dr. Silvia Comparini, the medical examiner, testified that Williams' body, forehead and arms had bruises and that the back of his left arm was covered almost entirely with blood. Dr. Comparini also described in her testimony the severe damage to Williams' brain, and she concluded that the cause of death was attributable to both the head injuries and the bullet wound, either of which could have been fatal.

Appellant did not call witnesses or testify in his own behalf. He moved into evidence a letter to him from Sharron Webb. He also asked the trial court to take judicial notice that he had been incarcerated from July 29, 1988 until November 29, 1988, a period which covered, in part, the time when LaWann Garris heard appellant admit shooting Williams, according to her testimony.

## II.

Appellant argues that the trial court erred in allowing the government to impeach three of its witnesses and in failing to give immediate cautionary instructions following that impeachment. A party may impeach its own witness with prior inconsistent statements if a good faith claim of surprise is made and if affirmative damage to its case results from the testimony. D.C.Code § 14–102 (1989);[1] *Jefferson v. United States,* 558 A.2d 298, 301 (D.C.1989), *cert. denied,* 493 U.S. 1032, 110 S.Ct. 748, 107 L.Ed.2d 765 (1990); *Scott v. United States,* 412 A.2d 364, 367–68 (D.C.1980); *Davis v. United States,* 370 A.2d 1337, 1339 (D.C.), *cert. denied,* 434 U.S. 853, 98 S.Ct. 168, 54 L.Ed.2d 123 (1977). The trial court is vested with broad discretion in determining the propriety of impeachment under D.C.Code § 14–102, and unless

---

1. D.C.Code § 14–102 reads as follows:

When the court is satisfied that the party producing a witness has been taken by surprise by the testimony of the witness, it may allow the party to prove, for the purpose only of affecting the credibility of the witness, that the witness has made to the party or to his attorney statements substantially variant from his sworn testimony about material facts in the cause. Before such proof is given, the circumstances of the supposed statement sufficient to designate the particular occasion must be mentioned to the witness, and he must be asked whether or not he made the statements and if so allowed to explain them.

the ruling has no rational basis, its finding of surprise will not be disturbed. *Stewart v. United States,* 490 A.2d 619, 624 (D.C.1985); *Parker v. United States,* 363 A.2d 975, 977 (D.C.1976). Having reviewed appellant's claims against the applicable standard, we find no prejudicial error in the trial court's rulings which appellant challenges.

### A. Impeachment of Eyvonne Garris

■ Appellant argues that the trial court erred in allowing the government to impeach its witness, Eyvonne Garris, without first demonstrating surprise or affirmative damage to its case. He also contends that the trial court's limiting instruction following the impeachment of this witness was inadequate. We conclude that even assuming that the foundation for the impeachment was inadequate, there is no basis for reversal because this witness adopted the prior statements as her testimony at trial. *See Jones v. United States,* 579 A.2d 250, 253 (D.C.1990); *Stewart, supra,* 490 A.2d at 625. In any event, the impeachment was harmless under the circumstances. *See Waldron v. United States,* 613 A.2d 370, 374 (D.C.1992).

■ We examine briefly the context in which the impeachment evidence was elicited. Ms. Garris was in the apartment when appellant returned after the shooting, and she was present that summer when appellant admitted the shooting. In an effort to show a basis for impeaching Ms. Garris, the government proffered that she stated prior to trial that she had heard appellant admit killing Williams. At trial Ms. Garris initially testified that she could not distinguish the voice of the person who made the statement among those present on either of two occasions when appellant was among them. However, Ms. Garris later admitted in testi-mony that she heard appellant say he shot the decedent.[2] Thus, she adopted the critical evidence with which the government sought to impeach her. When a witness adopts the prior inconsistent statement, the prior statement may be used as substantive evidence. *Jones, supra,* 579 A.2d at 253; *Stewart, supra,* 490 A.2d at 625. Even assuming a proper foundation was lacking, neither the absence of a proper foundation for the impeachment nor the omission of a cautionary instruction is reversible error where, as here, the witness adopts the impeaching evidence. *See Jones,* 579 A.2d at 253–54. Moreover, once the witness affirmatively testified that she overheard appellant say he shot the decedent, any error in admitting the impeachment evidence, which was to the same effect, was rendered harmless. *See Waldron, supra,* 613 A.2d at 374.

### B. Impeachment of Sharron Webb

■ Appellant also argues that the trial court erred (1) in permitting the government to impeach its witness, Sharron Webb, without first establishing surprise or affirmative damage to its case, and (2) in permitting the examination to exceed the scope of proper impeachment. He also contends that the court erred in failing to provide contemporaneously a limiting instruction. We conclude that a proper foundation was laid for the impeachment of Ms. Webb.

The prosecutor asked Ms. Webb what appellant had said about the murder that summer, anticipating that she would recount an inculpatory admission made to Webb by appellant. Instead, Ms. Webb testified to an exculpatory statement, *i.e.,* that appellant said that he was not going to jail for something he did not do. The prosecutor repeated the question, and Ms. Webb gave essentially the same response. At the bench

---

**2.** The pertinent testimony during which the witness adopted the prior statement occurred during questioning by the prosecutor in the following way:

 Q. Well, did you ever hear [appellant] say anything?
 A. Yes.

 * * * * * *

 Q. Only what [appellant] did, not what anybody else did. Did [appellant] ever say what he did?

 A. You mean specifically to me?
 Q. No, that you overheard.
 A. He shot him.

 * * * * * *

 Q. When he said he shot him, did he say who the him was that he was referring to?
 A. There could only have been one person. Jeffrey, you know, Jeffrey, I don't know his last name.

conference which followed, the prosecutor expressed surprise and represented to the court that the testimony was contrary to what the witness told her, in the presence of police officers, several times shortly before trial. The trial court found the foundation for the impeachment adequate, and we agree.

■ The statute governing a party's right to impeach its own witness, D.C.Code § 14–102 (1989), vests broad discretion in the trial court, and its finding of surprise will not be overturned unless it is without a rational basis. *Stewart, supra,* 490 A.2d at 624. We cannot say on this record that the trial court's finding of surprise lacks a rational basis. In taking the contrary position, appellant argues only that Ms. Webb was "recalcitrant" about testifying, and therefore, the government should not have been surprised by the change in her account of events at trial. A claim of surprise is not defeated simply because a witness is reluctant to testify. *See Price v. United States,* 545 A.2d 1219, 1224 (D.C.1988). Since Ms. Webb had repeatedly told the prosecutor in the presence of others that appellant admitted shooting the decedent, the trial court's finding of surprise has a rational basis. Indeed, Ms. Webb's anticipated inculpatory statement was consistent with the statements of other witnesses. The prosecutor had no reason to expect that Ms. Webb would not only change her account at trial, but that she would also attribute an exculpatory statement to appellant.

Appellant also contends that the government failed to show the requisite affirmative damage to its case to allow the impeachment. The rule is that to justify impeachment of a party's own witness, that party "must demonstrate not only surprise, but affirmative damage to his case as well." *Scott, supra,* 412 A.2d at 367–68. We conclude that this foundational requirement of affirmative damage to the government's case was demonstrated. Ms. Webb testified that appellant had said with respect to the murder of Williams that he was not going to jail for something that he did not do. She repeated this testimony twice. Thus, she provided exculpatory evidence. This evidence also detracted from testimony of other government witnesses who were present and heard appellant say he shot the victim. Such testimony from a witness called by the government was particularly harmful. Accordingly, Ms. Webb's unanticipated testimony provided a sufficient basis for the trial court's finding of affirmative damage to the government's case. *See Price, supra,* 545 A.2d at 1225.

■ Appellant also argues that the government's impeachment of Ms. Webb exceeded the permissible scope of inquiry necessary to negate the harm caused to the government's case and that the testimony of the impeaching witness, Officer Hewick, did not support the claimed inconsistency. We find no abuse of discretion requiring reversal. Following her testimony that appellant said he did not do it, Ms. Webb denied hearing appellant implicitly threaten potential witnesses. The subject of this testimony, to which appellant did not object, was within the scope of the valid impeachment. The scope of impeachment is a matter within the sound discretion of the trial court, and we find no abuse of discretion requiring reversal. *See Scott, supra,* 412 A.2d at 367. Certainly, we find no plain error.

■ Finally, with respect to Webb's testimony, appellant contends that the trial court did not give a timely instruction on the limited use of the impeaching evidence. Although a cautionary instruction "is required when a party, surprised by its own witness, impeaches the witness with a prior inconsistent statement," *Johnson v. United States,* 387 A.2d 1084, 1087 n. 5 (D.C.1978) (en banc), the failure to give it does not automatically result in reversal. *Lucas v. United States,* 436 A.2d 1282, 1284 (D.C.1981). We review the record to ascertain whether the omission created a substantial likelihood of prejudice to appellant. *Stewart, supra,* 490 A.2d at 625. Having done so, we find no substantial likelihood that appellant suffered prejudice by the timing of the instruction. The court instructed the jury on the use of impeachment evidence several times during the course of the trial, including during the testimony of the immediately preceding witness, following the testimony of the two witnesses who completed the impeachment of Ms. Webb, and again in final instructions to the

jury. Even government counsel reminded the jury in closing argument that the impeachment evidence could be used only in assessing the witness' credibility. Therefore, even assuming error in the timing of the instruction, we find it harmless under the circumstances. *See Gordon v. United States,* 466 A.2d 1226, 1231 (D.C.1983) (such instructional error harmless where it can be said "with fair assurance that the verdict was not substantially swayed by the error").[3]

### C. Impeachment of Patricia Byers

Appellant raises similar arguments concerning the government's impeachment of its witness, Patricia Byers, appellant's sister. Again, appellant contends that the necessary foundation for the impeachment, surprise and affirmative damage to the government's case, was not shown and that the limiting instruction was given untimely.

At trial, Ms. Byers testified that she could not identify the people who were beating Williams that night. At one point she claimed that appellant had been in the apartment at the time of the shooting. Later, she testified that she did not see appellant, her brother, in the alley. Yet, in her grand jury testimony, Ms. Byers identified appellant and others by name as the persons who were beating Williams in the alley. The trial court found that the requirements of surprise and affirmative damage to the government's case were met because the witness, contrary to her grand jury testimony, essentially provided appellant with an alibi.

Appellant argues that the government knew that Ms. Byers had made statements subsequently at variance with her grand jury testimony concerning appellant's role in the

assault. This fact alone would not preclude a claim of surprise. *Parker, supra,* 363 A.2d at 977. In *Parker,* we upheld the trial court's ruling allowing impeachment by the government of its witness where defense counsel informed the prosecutor that the witness would testify inconsistently with testimony he had given before the grand jury. *Id.* We concluded that the prosecutor could expect that one is cognizant of the significance of the oath and has testified truthfully before the grand jury, even though he might give a different version under circumstances which might engender fear (*i.e.,* where the accused was present). *Id.* Finding a rational basis for the trial court's ruling, we upheld it. *Id.*

Similarly, we find here a rational basis for the trial court's finding of surprise where the prosecutor expected that the sworn trial testimony would be consistent with prior sworn grand jury testimony, rather than with informal discussions with defense representatives. Therefore, we cannot say there is no rational basis for the trial court's finding that the government was surprised that the witness testified inconsistently with the testimony she had given under oath. *See id.*

The trial court's findings of affirmative damage with respect to Ms. Byers' testimony also has a rational basis in the record, and accordingly, we find no abuse of discretion in its ruling in that regard. *Stewart, supra,* 490 A.2d at 624. The witness disclaimed that she had seen appellant among those in the alley. In fact, she ultimately testified that he was in the house at the critical time. This unexpected alibi, presented through a government witness, was clearly damaging to its case.[4] Particularly

---

3. As to the court's refusal to repeat the limiting instruction after Officer Hewick's testimony, we conclude for the reasons stated above that any error in the timing of the instruction was harmless. *See Gordon, supra,* 466 A.2d at 1231. Nor do we find persuasive appellant's claim that the implication that appellant made threats to witnesses in this case is precluded as other crimes evidence. Such evidence was pertinent to consciousness of guilt and an expression of appellant's intent to conceal his involvement in the crime in this case, rather than evidence of other crimes. *See (John) Smith v. United States,* 312 A.2d 781, 784–85 (D.C.1973); *see also Lumpkin*

*v. United States,* 586 A.2d 701, 709 (D.C.), *cert. denied,* 502 U.S. 849, 112 S.Ct. 151, 116 L.Ed.2d 116 (1991).

4. We reject appellant's remaining arguments that the manner in which the government impeached the witness was improper and that the cautionary instruction was untimely. The manner of impeachment is within the trial court's discretion and will not be disturbed absent abuse. *Jefferson, supra,* 558 A.2d at 301; *Scott, supra,* 412 A.2d at 367. After examining the record, we find no abuse of discretion. An instruction was given on the morning following the end of the day

damaging was testimony that the witness did not see appellant in the alley, even though she observed who was there. It is likely that she would have recognized her own brother if he had been there. Thus, there was a rational basis to find affirmative damage to the government's case from the witness' change of her story.

## III.

 Appellant argues that the court erred in denying without a hearing his motion for a new trial based upon newly discovered evidence. The proffered evidence consists of the recantation by Raeshawn Garris of her trial testimony that she heard appellant say that he shot the man (Jeffrey Williams) and the statement obtained from co-defendant Everett Baylor, who said that he never saw appellant strike the victim nor run up the alley with co-defendant, Curseen. The prerequisites for granting a new trial based on newly discovered evidence are that: (1) the evidence must be newly discovered; (2) the moving party must show diligence in efforts to procure the new evidence; (3) the material must not be merely cumulative or impeaching; (4) it must be material to the issues involved; and (5) of such a nature that an acquittal would likely result from its use. *(Joel) Smith v. United States,* 466 A.2d 429, 432–33 (D.C.1983). The decision to deny the motion is within the trial court's discretion, and we review for abuse of that discretion. *Derrington v. United States,* 488 A.2d 1314, 1339 (D.C.1985), *cert. denied,* 486 U.S. 1009, 108 S.Ct. 1738, 100 L.Ed.2d 201 (1988).

 The trial court ruled that Baylor's statement was not newly discovered, relying on *Chirino v. National Transp. Safety Bd.,* 270 U.S.App.D.C. 396, 403, 849 F.2d 1525, 1532 (1988).[5] In *Chirino,* the court found no abuse of discretion in the Board's holding that under the particular facts of the case, the testimony of an alleged co-conspirator, who had chosen to remain silent during earlier proceedings, failed to qualify as newly discovered evidence. *Id.* at 404, 849 F.2d at

1533. The *Chirino* court did not go so far as to hold such evidence may never be considered to be newly discovered, and we do not do so here. *See also Ledet v. United States,* 297 F.2d 737, 739 (5th Cir.1962) (former co-defendant's testimony warranted granting appellant a new trial where he had asserted the privilege previously and did not testify, neither appellant nor his attorney knew what evidence he could offer, and the case involved ambiguous facts touching on appellant's culpability). Nevertheless, such offer of evidence must be scrutinized carefully. After conviction, a co-defendant has little to fear in attempting to exculpate others involved in the offense by assuming the entire blame. *United States v. Metz,* 652 F.2d 478, 481 (5th Cir.1981). As the Second Circuit Court of Appeals observed, "a [c]ourt must exercise great caution in considering evidence to be 'newly discovered' when it existed all along and was unavailable only because a co-defendant, since convicted, had availed himself of his privilege not to testify." *United States v. Jacobs,* 475 F.2d 270, 286 n. 33 (2nd Cir.), *cert. denied,* 414 U.S. 821, 94 S.Ct. 116, 38 L.Ed.2d 53 (1973). These considerations suggest that each case must be judged on its particular facts.

 The trial court denied the motion, holding that: (1) the statement of co-defendant Baylor was not newly discovered evidence, but merely newly available evidence; (2) appellant failed to demonstrate due diligence after Baylor's plea; and (3) the proffered evidence would probably not produce an acquittal on retrial. We need not address further the first two grounds for the trial court's denial of the motion because we agree that the nature of the evidence is not such as would produce an acquittal. Two other witnesses, Carlton Coleman and Charles Sharpe, testified that appellant was one of the men who chased the decedent down the alley before the shooting. Coleman also testified that appellant participated in both beatings of the victim that evening. Both

---

when the impeachment occurred. Any error in the timing of the instruction was cured because it was given close to the time of the impeachment.

5. Mr. Baylor, who was being tried with appellant and Mr. Curseen, entered a plea of guilty while the jury was deliberating.

LaWann and Eyvonne Garris testified that appellant admitted shooting the victim.

Although the government had to impeach Eyvonne Garris with her prior statements, she ultimately adopted the evidence used to impeach her and testified that appellant admitted shooting Jeffrey Williams.[6] Appellant points out that the proffered evidence from Baylor should be considered with the favorable testimony which could be provided by his former girlfriend, Sharron Webb, and his sister, Patricia Byers. Both of these witnesses are subject to impeachment with prior statements which inculpate appellant. Given this factor, and particularly the substantial evidence against appellant, we cannot say that the trial court abused its discretion in concluding that the proffered testimony of Baylor that he did not see appellant strike Williams or run up the alley, would probably not have produced an acquittal. *See (Joel) Smith, supra,* 466 A.2d at 432 (decision on new trial motion not reversible absent clear showing of abuse of discretion); *see also Poteat v. United States,* 363 A.2d 295, 296–97 (D.C.1976).

We consider next the proffered recantation of the government's witness, Raeshawn Garris. This witness is prepared to testify that her testimony at trial, that she heard appellant say "I shot him," was false. In denying a new trial on consideration of Garris' recantation of her trial testimony, the trial court found that the evidence was cumulative, that appellant had not demonstrated due diligence in obtaining it, and that it would not likely produce an acquittal.

Generally, the initial inquiry is whether the court is "reasonably well satisfied that the prior testimony was false," *Derrington, supra,* 488 A.2d at 1339 (citing *United States v. Kearney,* 220 U.S.App.D.C. 379, 385, 682 F.2d 214, 220 (1982)). However, it is unnecessary to determine the truth or falsity of the prior testimony where, as here, appellant fails to show that: (1) the recantation is newly discovered or (2) the evidence is of a nature which would probably produce an ac-

quittal. *See Nowlin v. United States,* 382 A.2d 9, 14 n. 7 (D.C.1978).

Appellant also seems to argue that having determined the evidence to be material, the trial court should not have addressed whether it was cumulative. We disagree. The "not cumulative or impeaching" factor is a separate issue from materiality, and it is often reflected as a separate prerequisite. *See (Joel) Smith, supra,* 466 A.2d at 432–33; *see also Heard v. United States,* 245 A.2d 125, 126 (D.C.1968). Therefore, we find no error in the trial court's consideration of materiality and "cumulative and impeaching" as separate elements. Weighing the proffered new evidence against the evidence adduced at trial, the trial court determined that it was unlikely to produce an acquittal. *See Johnson v. United States,* 537 A.2d 555, 562 (D.C.1988). We find no abuse of discretion in the ruling because the record supports that conclusion.

## IV.

Appellant contends that the prosecutor engaged in impermissible and prejudicial closing and rebuttal arguments. We conclude that none of the challenged portions of the argument, considered separately or together, warrant reversal. In reviewing claims of prosecutorial misconduct, we consider first whether impermissible conduct occurred. *Gray v. United States,* 589 A.2d 912, 916 (D.C.1991). If it did, then we determine whether reversal is required based upon "the gravity of the misconduct, its relationship to the issue of guilt, the effect of any corrective action of the trial judge and the strength of the government's case." *Dixon v. United States,* 565 A.2d 72, 75 (D.C.1989). If appellant failed to object at trial, we reverse only "if the misconduct is so clearly prejudicial to [his] substantial rights as to jeopardize the fairness and integrity of [the] trial." *Id.; Sherrod v. United States,* 478 A.2d 644, 655 (D.C.1984); *Watts v. United States,* 362 A.2d 706, 709 (D.C.1976) (en banc). If appellant

6. Co-defendant Curseen also entered a plea of guilty. His testimony presumably would be available to the government at any retrial. During the plea hearing, he testified that appellant

took the gun from him after he fired and missed and that he ran along side of appellant as the latter shot Williams.

properly preserved his objections, then we must determine whether we can say with fair assurance that the verdict was not substantially swayed by the error. *Kotteakos v. United States,* 328 U.S. 750, 765, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557 (1946); *Dixon, supra,* 565 A.2d at 75; *Dyson v. United States,* 418 A.2d 127 (D.C.1980). It is against these standards that we consider each of appellant's specific claims of impermissible prosecutorial argument.

■ Appellant argues that since there were no witnesses to the shooting, it was improper for the prosecutor to argue that appellant took the gun from co-defendant Curseen's hand and shot Jeffrey Williams in the back. Appellant also argues that this part of the argument was inflammatory, describing the murder as "[t]he coward's way," which did not allow the victim a chance to fight.

■ A prosecutor may comment on reasonable inferences and extrapolations from the evidence. *Irby v. United States,* 464 A.2d 136, 140 (D.C.1983). This part of the challenged argument was fairly inferable from the facts in evidence. Curseen was seen with the gun first, and there was evidence that appellant, who along with Curseen was chasing the victim, fired the shot which killed him. The medical examiner testified that the victim was shot in the back. Thus, the prosecutor's argument, which is fairly inferable from the evidence, is not impermissible. *See id.*

■ We also reject appellant's claim that this aspect of the argument was phrased so as to inflame the jury. The government could properly emphasize how the shooting occurred according to the evidence, as well as the lack of an opportunity for the victim to defend himself. The government was required to prove the element of premeditation beyond a reasonable doubt, and it was not obliged to avoid commenting on those aspects of the evidence which tended to prove it. Cases such as this have "an inherent emotional impact," and the prosecutor is not

required to "sanitize the government's evidence or make it appear less wrenching than it is." *Dixon, supra,* 565 A.2d at 73. Therefore, we find no error, much less plain error, in this part of the challenged argument.[7]

■ We turn to consideration of two of the prosecutor's remarks to which appellant objected at trial. The prosecutor argued that appellant said, "Yeah, I shot him, but they can never prove it," and the prosecutor also remarked that appellant and his friends "had premeditation to kill anyone who got in their way, anyone who crossed them, anyone who tried to steal their drugs." The court sustained objections to both arguments. Taking the first point, only the second phrase, "they can never prove it," was not evidence at trial.[8] The second passage, which focuses on all the assailants involved, appears to be established by the evidence which showed that the attack on Jeffrey Williams was provoked by Williams' attempt to steal drugs. To the extent that the latter argument might suggest that the actions of appellant and his co-defendants would be directed toward someone other than Williams, the prosecutor's argument is not supported by the evidence. We also agree that this argument tends to be inflammatory.

Although the trial court sustained objections to both arguments, appellant contends that the corrective measures were inadequate to ameliorate the gravity of the transgressions. We disagree. In both instances, the court instructed the prosecutor to rephrase the argument, and she did so. In the case of the "premeditation" statement the court admonished the prosecutor in the presence of the jury that the statement was too broad and that she must stick to the facts. During final instructions, the court instructed the jury that the statements and arguments of counsel are not evidence. Any errors arising out of these arguments do not rise to the level of substantial prejudice, considering the nature of the misconduct, the corrective action taken, and the strength of the government's case. *See Powell v. United States,*

7. Appellant did not object below to the portion of the prosecutor's argument under discussion.

8. This remark is a characterization of evidence introduced only for the purpose of impeaching Sharron Webb.

455 A.2d 405, 411 (D.C.1982). We are satisfied that the judgment was not swayed substantially by the foregoing arguments. *See id.*

■■■■ Appellant also argues that the government appealed improperly to the passions and prejudices of the jury during two portions of the rebuttal argument. We find no reversible error as a result of either argument. In one instance, appellant contends that the prosecutor improperly sought to place the jurors in the position of the deceased. Such arguments are improper. *See Hawthorne v. United States*, 476 A.2d 164, 172 (D.C.1984). However, in this case, the "you" appears to be rhetorical. The argument was interrupted by defense counsel's objection, which was sustained by the court, and the prosecutor then rephrased it.[9] Appellant's counsel made the objection in the presence of the jury, pointing out that the argument appealed to passion and that it was "unfair." We cannot ignore the impact and curative effect of an objection sustained after defense counsel's remark. Read in context, the argument appears to address the arguments made by the attorneys for the defendants in which they questioned the severity of the beating administered to Williams and suggested that Williams' injuries resulted from a fight. The argument also capsulizes the injuries as recounted by the medical examiner and basically suggests that Dr. Com-

parini's testimony regarding the extent of the injuries should be convincing. The facts of a case such as this are typically wrenching. Therefore, we have cautioned prosecutors to guard against overdramatizing the facts. *See Thacker v. United States*, 599 A.2d 52, 61 (D.C.1991). However, such language generally, without more, will not warrant reversal. *Id.* Here, even assuming error, we find it insufficient to warrant reversal under the standard by which we are bound. *See Kotteakos, supra*, 328 U.S. at 765, 66 S.Ct. at 1248.[10]

## V.

■■■ Appellant raises two other claims of error, each of which we reject. He argues that there was a substantial variance between the indictment and the government's theory of the case. This argument is premised on the theory that both co-defendant Curseen and appellant were indicted as principals in the murder, while the government offered evidence that it was appellant who shot Williams. There is no showing that the proof at trial differed materially from the facts alleged in the indictment. *See Byrd v. United States*, 579 A.2d 725, 727 n. 6 (D.C.1990).

■■■ Finally, appellant contends that he was entitled to a special instruction on unanimity because the government presented

9. The challenged portion of the argument appears below in the second paragraph along with the paragraph which preceded it and the rephrased argument.

 [GOVERNMENT]: Jeffrey Williams died two deaths on December 7, 1987 and [counsel for Baylor] wants to make a big issue about what Dr. Comparini [the medical examiner] said about the cause of death in this case. He said, "Well, Dr. Comparini couldn't tell you anything other than blood in the head that caused the subarachnoid hemorrhage in the decedent's head."

 Isn't that enough? Don't you think that if your brain was bleeding, if there was blood, if your brain was hemorrhaging, don't you think if you had been beaten in the head, don't you think if you had been hit by a rake or a baseball bat or a fist, don't you think that if your brain started hemorrhaging—

 [COUNSEL FOR APPELLANT]: Your Honor, counsel is putting the jurors in the place of the deceased and that's grossly inflaming passion and its unfair.

 [COURT]: Objection sustained. Rephrase it, please.

 [GOVERNMENT]: Don't you think that Jeffrey Williams—take Jeffrey Williams. Don't you think that Jeffrey Williams' brain was hemorrhaging? He was hit in the head. He was beaten in the head. Don't you think that after all that beating, that that was enough to kill him?

10. We reject appellant's challenges to an additional portion of the argument which he contends appealed to the passions of the jury which described the beating as unmerciful, but which mercifully resulted in the victim "probably" not feeling a thing when the "final screw" was placed in his coffin. The argument improperly appeals to the passion of the jury, but appellant did not object at trial. Therefore, we review for plain error. The isolated remark was not so egregious as to "jeopardize the fairness and integrity of appellant's trial." *See Irick v. United States*, 565 A.2d 26, 32 (D.C.1989).

two theories regarding the cause of Williams' death, blunt force trauma and gunshot wound. A special instruction is required when "there is evidence tending to show *legally* separate incidents ... not just factually separate incidents." *Scarborough v. United States,* 522 A.2d 869, 873 (D.C.1987) (en banc). Here, the case did not present separate and distinct offenses. The indictment charged, in a single count, murder as a result of injuries sustained in the shooting and beating. The medical evidence was that injuries from both caused decedent's death. Those injuries were inflicted during a unified time frame. Appellant did not raise separate defenses. Moreover, it is clear from the verdict form that the jury found appellant guilty of first-degree murder while armed with a gun.[11]

For the foregoing reasons, the judgments of conviction appealed from hereby are

*Affirmed.*

---

11. In this case, the chance of error was virtually eliminated by the verdict form, the court's instruction about how to use it, and the general unanimity instruction. The verdict form and the court's instruction required the jury to consider separately whether the government had proven beyond a reasonable doubt first-degree murder while armed with a gun and murder I (punching). The jury returned separate verdicts against Byers of guilty of first-degree murder while armed (gun). As to first-degree murder (punching), the jury found Byers not guilty.